1

2

3

4              **UNITED STATES DISTRICT COURT**

5                   **DISTRICT OF NEVADA**

6

7   UNITED STATES OF AMERICA,                    )
                                                 )
8                          Plaintiff,            )    Case No.   2:09-cr-00032-KJD-GWF
                                                 )
9   vs.                                          )    **FINDINGS & RECOMMENDATIONS**
                                                 )
10  DEANDRE NAKITA BROWN,                        )    **Motion to Suppress - #16**
                                                 )    **Motion to Suppress - #17**
11                         Defendant.            )
    _____       )

12

13         This matter is before the Court on Defendant's Motion to Suppress Evidence Obtained in

14  Violation of the Fifth and Fourth Amendments (#16), filed on March 20, 2009; Defendant's Motion to

15  Suppress Identification Evidence (#17), filed on March 20, 2009, and the Government's Combined

16  Opposition to Defendant's Motions to Suppress Evidence and Identification (#20), filed on April 2,

17  2009.  The Court conducted an evidentiary hearing regarding these motions on April 10, 2009.

18         Defendant Deandre Brown is charged in an indictment filed on February 3, 2009 with

19  interference with commerce by robbery in violation of 18 U.S.C. § 1951, possession of a firearm during

20  a violent crime in violation of 18 U.S.C. § 924(c), and felon in possession of a firearm in violation of 18

21  U.S.C. § 922(g)(1) and § 924(a)(2).  The foregoing charges arise out of the alleged robbery of a casino

22  change person in an Albertson's supermarket on the evening of December 24, 2008.  Pursuant to the

23  Fourth Amendment, Defendant moves to suppress all evidence obtained as a result of his seizure and

24  arrest on the grounds that the police did not have probable cause or reasonable suspicion to stop and

25  detain him.  Defendant moves to suppress statements made by him on the grounds that they were

26  obtained in violation of his *Miranda* rights.  Defendant also moves to suppress his identification by the

27  alleged victim on the grounds that the circumstances of the identification were impermissibly suggestive

28  and unreliable and should not be admitted in evidence.

1                              **FACTUAL BACKGROUND**

2          Janet Castle testified that on December 24, 2008 at approximately 9:30 p.m. she was working as

3   a change person in the video gaming/slot machine area in the Albertson's supermarket located at 1650

4   N. Buffalo Drive in Las Vegas, Nevada.   At that time, a black male adult approached Ms. Castle,

5   pointed a gun at her and demanded the money in her cash drawers.  Ms. Castle testified that the robber

6   demanded that she turn over the large bills.  She told the robber that the drawer which contained the

7   large bills was time locked and could not be opened for another 20 minutes.  She testified that the

8   robber threatened to kill her if she did not comply with his instructions.  Ms. Castle testified that she

9   opened the two top cash drawers and the robber removed the cash from those drawers.  This included a

10  "bait pack" of currency which contained an electronic transmitting device.  The robber then fled out of

11  the supermarket.  Ms. Castle did not observe in which direction the robber fled or whether he entered an

12  automobile.  She then called 911 and reported the robbery.  Police officers arrived at the store within 3-

13  5 minutes.

14         Ms. Castle testified that she informed the 911 operator and the police that the robber was a

15  young black male adult.  She estimated his height at 5 feet 6 inches to 5 feet 8 inches and his weight to

16  be 170 lbs.  She described his face as thin.  Ms. Castle testified that the robber had a "thin palate."  She

17  stated that she used to be a photographer, so she knows about facial shapes.  Ms. Castle also testified

18  that she informed the 911 operator or the police that the robber was wearing a maroon color "hoodie,"

19  i.e., a hooded sweatshirt, a dark or red shirt underneath and black jeans.  She testified that the robber

20  had the sweatshirt hood pulled tightly around his face, so that only the front of his face was visible.

21         Ms. Castle testified that shortly after the police arrived she was driven by a female police officer

22  to a location near the Albertson's store where two black males were displayed to her.  Ms. Castle told

23  the officer that neither of these men was the robber.  She was then taken back to the store.  About 30-45

24  minutes later, Ms. Castle was taken by the same police officer to the parking lot of the Texas Station

25  Casino which is located a few miles from the Albertson's store.  At that location, the police officers

26  displayed three black males to her.  Ms. Castle remained seated in the patrol vehicle during this

27  viewing.  The individuals were standing side-by-side about 20 feet from her.  The police officer who

28  was with Ms. Castle placed a spotlight on each of the individuals so that she could clearly see them.

1    The officer told her to take her time.  Ms. Castle testified that one of the men was too tall to be the

2    robber.  Of the remaining two individuals, Ms. Castle identified the Defendant Deandre Brown as the

3    robber.  Ms. Castle acknowledged that she was not 100 percent sure that Defendant was the robber, but

4    she was 90-95 percent certain.  She testified that she would have liked to have seen the Defendant's

5    mouth close up to be completely certain in her identification.  She was not afforded that opportunity.

6           Contrary to the description of the suspect that Ms. Castle initially gave the police, the Defendant

7    was wearing a green colored hooded sweatshirt, not a maroon one.  His jeans were also blue instead of

8    black.  Ms. Castle testified that at the time she identified the Defendant, she informed the officer that

9    the color of the sweatshirt was different.  The officer told her not to worry about that because suspects

10   may change their clothing.  Ms. Castle testified that she viewed the surveillance video of the robbery

11   two days before the evidentiary hearing and she was surprised to see that the color of the hoodie worn

12   by the robber was, in fact, dark green and not maroon.

13          Metro robbery detective Lance Spiotto testified that he was notified of the robbery by page.  He

14   testified that his unmarked police vehicle was equipped with a electronic receiving device for the

15   transmitter in the bait pack.  The electronic unit in his vehicle has a display screen with an arrow which

16   points the vehicle in the direction of the transmitting device.  The screen also displays signal strength

17   bars which increase as the receiving unit gets closer to the transmitter.  Detective Spiotto was reluctant

18   to testify about how this tracking equipment works because he had been told that it is confidential

19   information.  After being instructed by the Court that he was required to respond to questions about how

20   the equipment functioned, Detective Spiotto testified that he believes the signal from the transmitting

21   device is picked up directly by the receiving unit in his vehicle.  He is also aware that the signal is

22   transmitted to radio towers located at various places in the Las Vegas Valley.  A tower will be "hot" or

23   "cold" depending on whether the transmitter is near or far from the tower.  He did not have a clear

24   understanding, however, whether the signal received on the device in his vehicle is transmitted through

25   the tower(s) or is received directly from the transmitter.

26          Detective Spiotto testified that he drove in the direction of the arrow which led him to the Texas

27   Station Casino.  The signal grew stronger as he arrived at the Texas Station.  He observed a tan

28   Chevrolet Monte Carlo automobile stopped in the parking lot near the west front of the casino and the

1    entrance to the parking garage located on the north end of the casino.  A black male was standing by the

2    passenger window of the vehicle and appeared to be talking to persons inside the vehicle, although

3    Detective Spiotto could not see inside the vehicle.  The arrow on the receiving device pointed toward

4    that vehicle.  Detective Spiotto testified that he drove his vehicle around the Monte Carlo automobile

5    and as he did so, the arrow on the receiving device continued to point toward the vehicle, indicating that

6    the transmitting device was located in or near the vehicle.

7         Detective Spiotto testified that he requested back-up support at the Texas Station and kept the

8    Monte Carlo vehicle under surveillance until a marked patrol vehicle operated by Officer Moon arrived.

9    Detective Spiotto and Officer Moon stopped their vehicles behind the Monte Carlo and activated their

10   emergency lights.  They ordered the individual standing beside the vehicle to walk toward them and he

11   did so.  Detective Spiotto also testified that he and Officer Moon instructed any persons inside the

12   vehicle to exit the vehicle and come back toward the officers.  A black male exited the passenger side of

13   the vehicle and came back to the officers.  Another individual, who was subsequently identified as

14   Defendant Deandre Brown, exited the driver's door of the vehicle with his hands raised.  As soon as he

15   cleared the vehicle door, however, Defendant took off running into the parking garage.  Detective

16   Spiotto chased after the Defendant into the garage.  As he did so, he was passed by two marked patrol

17   vehicles with their lights and sirens activated.  Detective Spiotto ceased chasing Defendant and returned

18   to where Officer Moon and the two other suspects were located.  Detective Spiotto testified that the two

19   other suspects were subsequently interviewed and released.

20        Officer Andre Bates testified that his patrol vehicle was also equipped with an electronic

21   receiving device.  He testified that he responded to the robbery call and headed toward the Albertson's

22   store.  As he neared the area, the receiving device in his patrol car activated to the signal from the

23   transmitter and he began following the directions toward the location of the transmitter.  Officer Bates

24   testified that in addition to the signal bars, the device in his patrol vehicle emits a sound which becomes

25   louder as it gets closer to the transmitter.   The signal led him to the intersection of Decatur and Lake

26   Mead.  At that time, other officers with tracking devices were broadcasting their locations and the

27   readings from their devices over the police radio.  Officer Bates testified that a detective, whom he later

28   learned was Detective Spiotto, reported that he had a strong signal on his device at the Texas Station.

1   Officer Bates therefore proceeded to that location and upon arriving observed the Chevy Monte Carlo

2   vehicle and police vehicles.  He also saw an individual running into the parking garage and that the

3   detective was giving chase.  Officer Bates testified that Detective Spiotto was advising officers over the

4   radio what was occurring.  Officer Bates drove past Detective Spiotto in pursuit of the fleeing suspect.

5   He testified that the arrow on the receiving device in his vehicle pointed toward the rear of the garage

6   where the suspect was fleeing.

7   　　　Officer Donald Cox also arrived at the Texas Station in response to dispatch information.  His

8   patrol vehicle was not equipped with a receiving device.  He followed Officer Bates' vehicle in pursuit

9   of the fleeing suspect, Defendant Brown.  Officers Bates and Cox testified that the Defendant entered a

10  stairwell at the rear of the parking garage and proceeded up to the second floor.  The officers exited

11  their vehicles and continued the pursuit on foot.  They momentarily lost sight of the suspect in the

12  stairway.  Officers Cox and Bates both testified that after Defendant entered the stairwell and was

13  momentarily out of their sight, they heard a sound of metal striking the ground and sliding on the

14  pavement.  It is the Court's understanding that a firearm was subsequently found in the garage.  On

15  cross-examination both officers acknowledged that there was no reference in the written police reports

16  to the officers having heard the sound of metal hitting the ground.

17  　　　Once they reached the second floor, Officers Bates and Cox again observed the Defendant and

18  continued to chase him.  Officer Cox caught and tackled the Defendant and placed him in handcuffs.

19  Officer Cox then radioed that the suspect had been captured.  Other officers and detectives then drove

20  up to the second level of the garage.  Defendant was placed by a marked patrol car.  One of the

21  detectives, Patrick Flynn, approached Defendant with a handheld tracking device.  The device emitted

22  an increasingly louder and constant noise as the detective approached Defendant.  Officer Cox testified

23  that Defendant appeared to panic as the noise grew louder and stated he did not have any narcotics --

24  that there was no dope in his pockets.  Officer Bates also testified that Defendant spontaneously stated

25  that "this is not dope money" before any questions or statements were made by the officers.  According

26  to Officer Cox, the detective asked Defendant if he could check his pockets.  Defendant said yes.  The

27  detective then pulled wads of money out of Defendant's pockets and put it on the hood of the car.

28  Officer Cox testified that the detective asked Defendant where he got the money.  The Defendant

1   responded that he obtained it from gambling.   Officer Bates testified that the detective also asked

2   Defendant his name.  Officers Bates and Cox testified that Defendant was not advised of his *Miranda*

3   rights prior to making his statements or responding to the detective's questions.  Defendant was then

4   placed in a police vehicle.  The detectives searched through the money and found the transmitter.

5        On cross examination, Officer Bates testified that the description of the suspect that was initially

6   broadcast stated that he was wearing a maroon sweatshirt and black pants.  On redirect examination, he

7   also testified, after reviewing the dispatch log, that an updated description was broadcast which

8   described the suspect as wearing a black or dark green sweatshirt, a red shirt underneath and possibly a

9   white T-shirt under that.  Apparently, a later description was broadcast regarding some type of markings

10  on the rear of the suspect's pants.  Officer Bates did not recall Defendant having such markings on his

11  pants.  Officer Bates testified, however, that he pursued the Defendant based on Detective Spiotto's

12  radio communication and his observation that the suspect was fleeing from the officers, and not because

13  Defendant specifically matched the broadcast descriptions of the robbery suspect.

14       Detective Patrick Flynn testified that he initially responded to Albertson's store in response to

15  the robbery report.  Detective Flynn testified that he reviewed the surveillance video of the robbery.  He

16  testified that the suspect in the video was wearing a dark brown or green hooded sweatshirt and blue

17  jeans.  While at Albertson's, Detective Flynn was informed of the events at Texas Station.   Detective

18  Flynn proceeded to Texas Station where the officers had two suspects in custody in the parking lot and

19  another suspect was in custody on the second floor of the parking garage.  Detective Flynn testified that

20  he walked the path that the suspect had traveled while fleeing from the officers to look for any evidence.

21  Detective Flynn also testified that he was in possession of a handheld tracking device.  As he proceeded

22  into the garage, the signal from the transmitter became louder on his device.  Detective Flynn made his

23  way to the second floor where he observed the Defendant in custody of other officers.  Detective Flynn

24  approached Defendant and the officers.  As he did so, the handheld device gave off a very strong

25  audible signal.  Detective Flynn testified that he approached the Defendant who was in custody and

26  began to perform a search of him incident to arrest.  He removed large amounts of money from

27  Defendant's front pockets.  Detective Flynn went through the money and located the transmitter.

28  Detective Flynn testified that he did not ask Defendant any questions, including where he obtained the

1  money that was found in his pockets.  Detective Flynn testified that Defendant was not *Mirandized*  in

2  his presence.

## DISCUSSION

4  **1.      Whether the Officers Had Probable Cause to Arrest Defendant:**

5  Under the Fourth Amendment, a warrantless arrest requires probable cause.  *United States v.*

6  *Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007), citing *Michigan v. Summers,* 452 U.S. 692, 700, 101 S.Ct.

7  2587, 69 L.Ed.2d 340 (1981).  Probable cause to arrest exists when officers have knowledge or

8  reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an

9  offense has been or is being committed by the person being arrested.  *Lopez, supra,* citing *Beck v. Ohio,*

10  379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).  The Ninth Circuit has alternatively defined

11  probable cause as "when 'under the totality of circumstances known to the arresting officers, a prudent

12  person would have concluded that there was a fair probability that [the defendant] had committed a

13  crime.'"  *Lopez,* citing *United States v. Smith,* 790 F.2d 789, 792 (9th Cir.1986).  While conclusive

14  evidence of guilt is not necessary to establish probable cause, "[m]ere suspicion, common rumor, or

15  even strong reason to suspect are not enough."  *Id.,* citing  *McKenzie v. Lamb,* 738 F.2d 1005, 1008 (9th

16  Cir.1984) (citing *Henry v. United States,* 361 U.S. 98, 101, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959)).

17  Defendant contends that the police did not have probable cause or reasonable suspicion to stop

18  and detain him because there were no objective factors indicating that he was engaged in criminal

19  activity.  Defendant suggests that the officers stopped and detained him solely because he was a young

20  African-American male adult and matched that general racial characteristic of the robber.  Based on the

21  hearing testimony, the Court finds no basis for this assertion.

22  Ms. Castle told the police that the robber was a young black male adult and provided a physical

23  description of his height and weight and the clothing he was wearing.  Ms. Castle's description of the

24  robber, including that he was wearing a maroon sweatshirt, was broadcast to officers.  Police officers

25  responded to the Albertson's store and viewed the surveillance video which confirmed that a robbery

26  had occurred.  The police also determined from the video that the color of the sweatshirt worn by the

27  robber was black or dark green and they also broadcast that corrected description.  The decision to stop

28  and detain Defendant, however, was not based on his matching the physical descriptions of the robber.

7

1   The officers testified that Defendant was stopped, detained and arrested because the signal from the

2   transmitter in the bait pack led the officers to the Texas Station and the vehicle Defendant was

3   occupying and because Defendant fled when he was instructed by the officers to exit the vehicle and

4   walk back toward them.  Once Defendant was captured, Detective Flynn determined that the transmitter

5   signal was emanating from Defendant's body and the transmitter was discovered in the money removed

6   from his pockets.

7        Defendant suggests that the police officers were not being truthful in testifying that the

8   transmitter signal led them to the Defendant.  Detective Spiotto did not state where he was located when

9   the receiving unit in his vehicle began to receive signals from the transmitter.  He testified, however,

10  that he followed the directional arrows on the device to the Texas Station which is located

11  approximately five miles east of the Albertson's store.[1]  Upon arriving at the Texas Station, the arrow

12  on Detective Spiotto's tracking device pointed at the tan Chevrolet Monte Carlo automobile and

13  continued to point at that vehicle as he circled around it, indicating that the transmitting device was in

14  or very near that vehicle.  Officer Bates testified that when the tracking device in his patrol car

15  activated, he followed the directional display on the device which led him to the vicinity of Decatur and

16  Lake Mead Boulevard.  That intersection is less than a mile west of the Texas Station Casino.   Upon

17  hearing Detective Spiotto's radio report that he had a strong signal at the Texas Station, Officer Bates

18  proceeded to that location where he observed the suspect fleeing from Detective Spiotto into the garage.

19       Through cross examination, Defendant's counsel established that the transmitter signal may

20  contact various towers that are strategically located about the valley.  Whether a particular tower

21  becomes "hot" depends on the proximity of the transmitter to that tower.  According to Defendant's

22  counsel's cross-examination questions, dispatch records indicated that a tower near the Texas Station

23  may have been "cold" at or near the time the officers responded to that location, whereas a tower

24

25

26  [1]Fed.R.Evid. 201 permits courts to take judicial notice of generally known facts capable of
    accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
27  Courts have generally taken judicial notice of facts gleaned from internet mapping tools such as Google
    Maps or Mapquest. *United States v. Stewart*, 2007 WL 2437514 (E.D.Va. 2007) *1, n. 2., citing *Gordon*
28  *v. Lewistown Hospital*, 272 F.Supp.2d 393, 429 n. 34 (M.D.Pa. 2003).

1  located several miles away at the Meadows Mall was reported as "hot."  The dispatch logs or reports

2  were not introduced into evidence.   It was not clear from Detective Spiotto and Officer Bates'

3  testimony whether the receiving units in their vehicles receive signals directly from the transmitter or

4  only through the towers.  Neither officer appears to have the technical knowledge to accurately answer

5  this question.  Their descriptions of how the receiving units functioned tend to indicate, however, that

6  the units in their vehicles received the signal directly from the transmitter because the signal became

7  increasingly stronger the closer they came to the transmitter.  This is also consistent with the testimony

8  of Detective Flynn in regard to the handheld receiving device that he had.   Based on the testimony and

9  information provided during the hearing, the Court finds that Detective Spiotto's and Officer Bates'

10  testimony that their receiving units picked up the signal from the transmitter is credible.  The Court

11  further accepts that it was the signal from the transmitter that led Detective Spiotto to the Texas Station

12  and from there to identify the Monte Carlo automobile as the location of the transmitter.

13       The fact that the transmitter from the bait pack was located in the Monte Carlo automobile

14  provided Detective Spiotto, at minimum, with reasonable suspicion to believe that the robbery money

15  was in or near the vehicle and that the individual standing by the vehicle or a person inside the vehicle

16  was the robber.  Detective Spiotto and Officer Moon therefore had lawful grounds to stop and detain the

17  occupants of the vehicle as robbery suspects.  Reason to believe that Defendant Brown was the robber

18  was, of course, greatly strengthened when he fled into the parking garage.  *See Illinois v. Wardlow*, 528

19  U.S. 119, 124-125, 120 S.Ct. 673, 676-77 (2000) (holding that unprovoked flight from police officers

20  provides reasonable suspicion that the person is engaged in criminal activity).  In contrast to *Wardlow*,

21  Defendant did not merely flee when he saw officers approaching him.  He fled after being instructed by

22  Detective Spiotto and Officer Moon to exit the vehicle and to walk back toward them.  He continued to

23  flee after Officer Bates and Cox, both of whom were in uniform, pursued him and instructed him to

24  stop.  This information, combined with the evidence that the bait pack transmitter was in the vicinity,

25  provided probable cause to believe that Defendant was the robber.  Any doubt that Defendant was

26  probably the robber, was removed when Detective Flynn approached Defendant with his handheld

27  tracking device and the signal from the transmitter became very strong.

28  . . .

1    Although Officer Cox testified that the detective asked for and received permission from

2    Defendant to search his pocket, Detective Flynn testified that he did not ask for or obtain Defendant's

3    consent to search his person.[2]   Detective Flynn testified, instead, that Defendant was in custody and he

4    proceeded to search his person incident to arrest for obstructing the officers' investigation by fleeing

5    from them.  Nevada Revised Statute (NRS) § 190.190 makes it a misdemeanor to willfully hinder,

6    delay, or obstruct any public officer in the discharge of his official powers or duties.  Based upon the

7    totality of the circumstances, including the fact that Defendant fled from the officers and Detective

8    Flynn's tracking device indicated that the bait money transmitter was on Defendant's person, the Court

9    also finds that the officers had probable cause to arrest Defendant for the robbery.  The Court therefore

10    concludes, on either basis, that the search of Defendant's person was a lawful search incident to arrest.

11    *See United States v. Robinson*, 414 U.S. 218, 234, 94 S.Ct. 467 (1973); *Knowles v. Iowa*, 525 U.S. 113,

12    116-17, 119 S.Ct. 484 (1998).

13             **2.        Suppression of Defendant's Statements Under *Miranda*:**

14    Officers Cox and Bates testified that as the detective approached the Defendant with the

15    handheld tracking device, the Defendant stated that he did not have any narcotics, that there was no

16    dope in his pockets and that the money in his pockets was not "dope money."  Defendant was in custody

17    when he made these statements and he had not yet been informed of his *Miranda* rights.  According to

18    Officers Cox and Bates, however, Defendant made these statements before any questions were put to

19    him by the police officers.

20    The *Miranda* rule prohibits admitting statements given by a suspect during custodial

21    interrogation without prior warning.  Custodial interrogation means "questioning initiated by law

22    enforcement officers after a person has been taken into custody." *Illinois v. Perkins*, 496 U.S. 292, 110

23    S.Ct. 2394, 2397 (1990), quoting *Miranda*, 384 U.S. at 444, 86 S.Ct at 1612.  Interrogation refers not

24    only to express questioning, but also to any words or actions on the part of the police (other than those

25    normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an

26    _____

27         [2]Under the circumstances presented, there would be a substantial issue whether Defendant's
     alleged consent to search his person was voluntary. *See United States v. Soriano*, 361 F.3d 494, 502 (9th
28   Cir. 2004).

1 incriminating response from the suspect. *Rhode Island v. Innis*, 446 U.S. 291, 201 n. 5, 100 Sct. 1682

2 (1980); *United States v. Orso*, 266 F.3d 1030, 1033 n. 1 (9th Cir. 2001).  The Court finds that

3 Defendant's spontaneous statements are not subject to suppression under *Miranda* because Defendant

4 was not subjected to custodial interrogation as defined in *Innis* prior to making those statements.

5          Officer Cox also testified that the detective asked Defendant where he got the money and

6 Defendant responded that he got the money gambling.  Detective Flynn testified, however, that he did

7 not ask Defendant Brown any questions.  Officer Cox's testimony regarding Defendant's alleged

8 statement in response to the detective's question where he got the money is subject to suppression under

9 *Miranda*  because it was made in response to express police questioning before Defendant was advised

10 of his *Miranda* rights.  Even though Defendant's answer to the question is arguably not incriminating, it

11 is still subject to suppression.  *United States v. Orso*, 266 F.3d at 1033 n.1.

12          **3.          Suppression of Ms. Castle's Identification of Defendant as the Robber:**

13          Shortly after the robbery occurred, Ms. Castle was taken to a nearby location where she was

14 asked to observe two black male individuals who had been detained by the police.  Ms. Castle observed

15 these two individuals from inside the police car and informed the officer that neither individual was the

16 robber.  She was then returned to the store.  After Defendant and the other two subjects were taken into

17 custody at the Texas Station, Ms. Castle was taken to that location.  The three subjects, all of whom

18 were young black male adults, were placed side by side.  Ms. Castle again observed them from inside

19 the police car.  She stated that the three individuals were approximately 20 feet from her.  Ms. Castle

20 testified that she immediately ruled out one of the individuals standing on the end because he was too

21 tall to be the robber.  She then identified the Defendant, who was standing in the middle, as the robber.

22 Ms. Castle acknowledged that at the time she identified the Defendant, she was not 100 percent certain

23 in her identification.   She testified, however, that she was 90 to 95 percent certain.  She also testified

24 that she indicated to the police officer at the time that the Defendant's clothing was different from that

25 of the robber.  The officer told her, however, not to be concerned about that because suspects may

26 change their clothing.  It appears, in fact, that Defendant may not have been in different clothing, but

27 that Ms. Castle was simply mistaken in her belief that his sweatshirt was maroon in color.  Although

28 . . .

1   Ms. Castle was later informed that the bait money and transmitter were found on the Defendant, she was

2   not informed of this prior to identifying the Defendant.

3        The Court may exclude identification evidence on due process grounds where it is

4   impermissibly suggestive and unreliable. *Manson v. Braithwaite*, 432 U.S. 98, 113-14, 97 S.Ct. 2242,

5   2252-53 (1977). *See also United States v. Montgomery*, 150 F.3d 983, 992 (9th Cir. 1998), citing *Neil*

6   *v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375 (1972).   The admissibility of identification evidence is

7   governed by a two-step analysis.  The first step is to determine whether the identification procedure was

8   impermissibly suggestive.  If the court finds that a challenged procedure is not impermissibly

9   suggestive, the inquiry into the due process claim ends.  If the court finds the procedure impermissibly

10  suggestive, automatic exclusion of the evidence is not required.  The court, instead, considers whether

11  under the totality of the circumstances the identification is sufficiently reliable that it may be admitted

12  even though it was made pursuant to an unnecessarily suggestive procedure. *United States v. Bagley*,

13  772 F.2d 482, 492 (9th Cir. 1985)*, citing Manson v. Braithwaite, supra,* and *Neil v. Biggers*, 409 U.S.

14  188, 198-99, 93 S.Ct. 375, 381-82 (1972).  In determining whether the identification is sufficiently

15  reliable, the court should consider the following factors:  (1) the opportunity of the victim to view the

16  criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness'

17  prior description of the criminal; (4) the level of certainty demonstrated by the witness at the

18  confrontation; and (5) the length of time between the crime and the confrontation. *Bagley*, 772 F.2d at

19  492.

20        In *Bagley,* the defendant was taken into custody within an hour and a half after a bank robbery.

21  He was transported to the bank for the teller to observe him. The teller saw the defendant seated in a

22  police car, handcuffed and surrounded by law enforcement officials.  After getting a full view of the

23  defendant and hearing his voice, the teller identified him as the robber.  Nothing in the record indicated

24  that the officers encouraged the teller to identify the defendant. The court noted that in *United States v.*

25  *Kessler*, 692 F.2d 584, 585 (9th Cir. 1982), it held that a "one-on-one show-up" identification was a

26  legitimate procedure so long as the witness was not encouraged to make the identification.  The court

27  therefore held that it was unnecessary to reach the issue of whether the teller's identification was

28  reliable. *Bagley*, 772 F.2d at 492-93.

1     The identification procedure in this case was even less suggestive than the one approved in

2   *Bagley* and *Kessler, supra.*  Ms. Castle was presented with three black male subjects to observe at the

3   Texas Station.  She eliminated one of the subjects because he was too tall.  It appears from her

4   testimony that the other two subjects, one of whom was the Defendant, were of similar height and build.

5   There is no evidence that the officer who was in the vehicle with Ms. Castle made any statement to

6   encourage her to identify one of the individuals as the robber.  Therefore, the identification procedure

7   was not impermissibly suggestive.  Although the Court is not required to reach the issue, Ms. Castle's

8   identification of Defendant was sufficiently reliable to overcome any suggestiveness in the procedure.

9   Ms. Castle was face-to-face with the robber and clearly had the opportunity observe his face close-up.

10  It is clear that her attention was also focused on the robber and his appearance.  She observed the

11  defendant and the two other subjects approximately an hour to an hour and a half after the robbery.

12  Although she was not 100 percent certain that Defendant was the robber, she testified that she was 90-

13  95 percent certain in her identification.

14     The one weakness in Ms. Castle's identification of the Defendant was her belief that the robber

15  was wearing a maroon sweatshirt and black jeans, instead of a dark green sweatshirt and blue jeans as

16  was shown in the surveillance video.  It appears, however, that Ms. Castle was accurate regarding the

17  robber's approximate age, weight and build, as well as the fact that he was a black male.  The reliability

18  of Ms. Castle's identification is also strengthened by the fact that she had earlier ruled out two other

19  suspects.  Her testimony also indicates that she took care to make sure that she accurately identified the

20  robber.   Ms. Castle's identification of Defendant as the robber is therefore sufficiently reliable to be

21  admissible at trial.  Her inaccuracy regarding the color of the robber's clothing goes to the weight that

22  should be accorded to her identification testimony and not to its admissibility.

23                                                **CONCLUSION**

24     Based on the foregoing, the Court concludes that the police had probable cause to stop, detain

25  and arrest Defendant Deandre Brown as the person who robbed Ms. Castle at the Alberton's

26  supermarket.  The officers also had valid grounds to search Defendant incident to arrest.  The physical

27  evidence seized from the Defendant, his spontaneous statements to the officers, and his identification by

28  the alleged victim are therefore not subject to suppression under the Fourth Amendment.  Defendant's

1   spontaneous statements to the officers prior to any questioning are also not subject to suppression under

2   *Miranda* because they were not made during custodial interrogation.  Officer Cox's testimony that

3   Defendant stated he obtained the money gambling in response to a question from the detective,

4   however, should be suppressed because Defendant was in custody and had not been informed of his

5   *Miranda* rights.  The Court also concludes that the circumstances regarding Ms. Castle's identification

6   of Defendant were not impermissibly suggestive to require exclusion of her identification testimony.

7   Ms. Castle's identification was also sufficiently reliable to overcome any suggestiveness in the

8   identification procedure.  Accordingly,

9                                              **RECOMMENDATION**

10         **IT IS RECOMMENDED** that Defendant's Motion to Suppress Evidence Obtained in Violation

11   of the Fifth and Fourth Amendments (#16) be **denied** with the exception of Officer Cox's testimony

12   that Defendant stated he obtained the money gambling in response to a question from the detective.

13   That portion of Defendant's Motion (#16) should be **granted** on the ground that Defendant's alleged

14   statement was obtained in violation of *Miranda.*

15         **IT IS FURTHER RECOMMENDED** that Defendant's Motion to Suppress Identification

16   Evidence (#17) be **denied.**

17                                                  **NOTICE**

18         Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in

19   writing and filed with the Clerk of the Court within ten (10) days.  The Supreme Court has held that the

20   courts of appeal may determine that an appeal has been waived due to the failure to file objections

21   within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1)

22   failure to file objections within the specified time and (2) failure to properly address and brief the

23   objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues

24   . . .

25   . . .

26   . . .

27   . . .

28   . . .

1  from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi*

2  *Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

3          DATED this 23rd day of April, 2008.

4

5          _____
           GEORGE FOLEY, JR.

6          United States Magistrate Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28